May it please the Court, I am Jeffrey Adams, and I represent Appellants, the 24th Senatorial District Committee, and its Chairman, Kenneth Adams. The Committee and Mr. Adams were denied their day in court when the District Court prematurely dismissed their complaint at the pleading stage, and did so despite the fact that the jurisdictional fact in question in this factual dismissal was and is intertwined with the merits of the case, and also did so inappropriately because it did so without taking any evidence or conducting an evidentiary hearing. Moreover, the Court proceeded to impose its own interpretation on the party plan, its own resolution of the jurisdictional fact in question, in a way that we believe is clearly contrary to the plan, and we believe that we could rebut and establish a better and more reliable construction were we given the opportunity to proceed with evidence or better to proceed with a definitive interpretation of the plan by the Republican Party, which in the plan is given the authority to definitively interpret its own plan. In particular, the State Central Committee of the party is the final arbiter of the meaning of the plan. The Court was aware of this, and indeed references it in the Court's opinion. Nonetheless, the parties were denied the ability to pursue an opinion, excuse me, a determination by the State Central Committee of the relevant interpretation of the plan provisions. What additional facts do you think were needed to arrive at an interpretation of the plan in this case? I think there's a number of potential facts. One is testimony of individuals who are involved in the promulgation and amendment of the plan. So there could have been testimony of individuals who could have testified. But before you even get to that, I mean, the District Court's opinion suggested that everybody conceded that there were no facts in dispute and that she could move to resolve this dispute as a matter of law. Do you disagree with that? I do. That was purely at a motion for preliminary injunction. There was never a hearing on a motion to dismiss. In fact, our fellow appellant, Dan Moxley, was not even given time to brief the issues in the motion to dismiss before the Court proceeded to its decision. And so while we conceded for purposes of the motion for preliminary injunction that there weren't facts in the issue, we were proceeding on an timetable for conducting the election based on documents to which all parties stipulated the admissibility. We were not at all conceding that there were no factual issues in the case. Did you make that objection known to the Court? I did. In our brief, we do mention in distinguishing between Marshall v. Meadows and also to the District Court on motion to dismiss, we distinguish Marshall v. Meadows by the Court and also by the appellees. And we point out that in Marshall v. Meadows, all parties agreed that the Republican Party in that case had voluntarily chosen a primary as the method of conducting the nomination in that case. And the only question was whether that primary would be open or closed. Ultimately, the Court decided that since the party had voluntarily chosen a process knowing that the law of Virginia made it an open process, there was no standing to object to that process being open. We were distinguishing Marshall v. Meadows, and in particular, we noted that there was a dispute as to the interpretation of the plan that was articulated at the motion for preliminary injunction hearing. And I would even go on to say that the Court itself acknowledged that the plan in the Court's own view was ambiguous. The Court did not rule as a matter of law that the Court's interpretation was the sole interpretation of the plan. The Court said that there are reasonable interpretations before the Court and chose one rather than the other based on canons of construction that would not have been necessary had the plan been, you know, clear on its face. And so the Court was acknowledging an ambiguity, which is, in fact, a factual issue. Jay, would you explain how that impacts the standing question, how ambiguity impacts the question of standing? Well, it impacts it in this case. I mean, standing in this case always has come back to the issue of the plan interpretation. Has the Republican Party, in a sense, incorporated and acceded to the Incumbent Protection Act in the plan? And so the question is, does the plan accede to that act of the Virginia legislature, in which case there's really no redressability, there's no injury in fact related? I don't understand that because what choice does the committee have if there's a statute in place that says you will do X? Well, and that's our point. We believe that that's exactly right, Your Honor, that there is a statute in place and what the committee is doing is it's coming to the courts and saying, we agree that we're bound by Virginia law, but it's the province of the courts to tell us what the law is. And that's what we were asking the district court and that's what we're asking ultimately this court, although really we're here for the more procedural issue. But we were asking the district court, okay, concededly, we're bound by Virginia law. We don't reject that. But the question is, what are the contours and what are the outer limits of Virginia law? And that's defined not merely by the statute book. It's defined by what is constitutional. The Constitution is the highest law of the land. It's the highest law of Virginia. And so if this statute is in fact unconstitutional, which we believe it manifestly is, then the act, the incumbent protection act, fails as a matter of Virginia law and it also fails as a matter of something incorporated in the plan as Virginia law. Your opponents, as I understand it, suggest that you needed to do more. You needed to voice some kind of specific objection to the operation of the statute as opposed to simply saying that the nomination process will be as permitted by Virginia law. Is that right? Well, I think so. And I think it turns the cannons of construction on their head. You think that that's right? I think that is their argument. Right. Excuse me. I think that is their argument. And I think it actually flips the cannons of construction. The cannons of construction where a waiver of constitutional rights is alleged by contract. That requires clear and convincing evidence of waiver. And so silence or ambiguity is not sufficient to establish waiver. It has to be a clear, convincing, explicit waiver of constitutional rights. And what we believe the district court did and the apologies have argued is that there's this ambiguity here and the ambiguity in effect is interpreted as a waiver of these constitutional rights. And really a prospective waiver. That's an interesting point which I think is worth teasing out. That, you know, the relevant provision of the plan says we're permitted under Virginia law. It doesn't point to the act. It doesn't point to any provision, any particular provision of the law. It's talking about the entire law. And in that way it's different from Article 2, Paragraph 24 which comes up in the briefing which relates to the definition of primary which is focused on the electoral laws. And it's specifically limited to that. But it's referring to Virginia law and it's basically saying you're bound by Virginia law but now the courts are saying you have no capacity to know what Virginia law is. Let me make sure I understand what your position is here. Are you saying that you should prevail as a matter of law here or this case should go back for discovery as to jurisdictional facts? We believe it should be remanded. Okay. It seemed pretty clear to me that when the district judge issued her order she felt like she had everything she needed in front of her to make the legal decision she had to make. That there was no more evidence to be obtained. There was nobody else to check with. So what do you point to? What's the strongest indication you have in the record that you had not conceded that she had everything, that you anticipated discovery or additional activity? I would say two things. First of all, there's our briefing in which we explicitly state there are factual issues. I will say also the notice that was filed by, that was filed by appellees requesting that there be no further briefing and no hearing on the motion to dismiss, that actually states the Commonwealth's motion to dismiss is based on matters of law also presented in opposition to the preliminary injunction. So we believe that this was going forward purely as a question of law and it would have been treated as a facial challenge to standing. I'm not talking about what you believed. I'm talking about what she believed and what she would have been led to believe based on the papers before. Well, I think she, I think the district court conflated the motion for preliminary injunction with a motion to dismiss. Under Rule 65, we obviously had the burden to show likelihood of success on the merits. We did, we proceeded with that motion on a limited record. For purposes of that motion, which again was the only motion heard in the case, we conceded we didn't have any particular facts to add. Because keeping in mind, we, the standing issue was raised by the appellees on Friday before the motion for preliminary injunction, which was set for hearing on Monday. That was the first time in any of the briefing that interpretation of the plan was raised as a standing issue. So we went to the motion for preliminary injunction with what we had already teed up and what we could put together over the weekend. But the fact that we could not adduce evidence from Friday to Monday, certainly I don't believe is reasonably interpreted as an inability to produce any evidence on what is a factual issue. And which in effect the court concedes is a factual issue by holding that the plan is ambiguous and resorting to articles or principles of construction to interpret it. And so I'm not saying that that was an unreasonable position for the court to take, but I think it was incorrect and it's not supported by the record. We were there purely on a Rule 65 motion for preliminary injunction. And on the basis of our inability to establish that we had a reasonable likelihood of success on the merits, rather than just having that motion denied, we were thrown out of court entirely. Okay. Thank you, Mr. Adams. Let's hear from Mr. Boyer. Thank you, sir. Good morning, Your Honors. May it please the Court, my name is Rick Boyer. I represent Dan Moxley, the intervener plaintiff below. I'd ask to reserve two minutes for rebuttal. Mr. Moxley is challenging the constitutionality of the Incumbent Protection Act as a denial of equal protection. Now, at the outset, he makes no claim that there has been any denial of a fundamental right. But under Crawford v. Marion County Electoral Board and this Court's holding in Dixon v. Maryland Board of Elections, equal protection still requires that election-related restrictions must be neutral, they must be reasonable, they must be nondiscriminatory. Now, with regard to the standing question, the threshold issue this Court has to get to, I think it's most efficiently addressed with reference to this Court's holding in Dixon. The Commonwealth and the District Court would hold that the party, through its plan, either incorporates the act by reference, or it acquiesces to it, or in otherwise is not injured by the act. And since Mr. Moxley is a party member, he's bound to whatever the statute that the party acquiesces to. But suppose Virginia passed a filing fee, and the problem here is Virginia has created a classification between incumbent and challengers with no rational basis. Suppose Virginia passed a filing fee requirement and applied it only to challengers on the same distinction that it has created here. And the party acquiesced to that. Yet this Court in Dixon has found that a filing fee is a clear violation. Slow down just a little bit. I can't hear as fast as you talk. If you could just slow down just a little bit. We'll do that. I'll give you some extra time and consideration. Thank you, Judge. Mr. Moxley is not before this Court in the capacity of a mere party member, but of a challenger candidate. He is similar in all respects to an incumbent. And in this Court's Miller 2 decision, the Court held that an incumbent is not a representative of the party. He's a representative of his own interests. A challenger, therefore, must be similarly treated as a similarly situated individual. This act that puts the nomination decision squarely in the lap of the incumbent is just as much a violation of equal protection as a filing fee imposed only on the challenger. The crux of Mr. Moxley's argument is pretty simple. The act violates the equal protection clause in three critical ways. First, it unconstitutionally discriminates by creating two classes, and this is the key fact, incumbent and challenger, and singling them out for disparate treatment. In all material respects, incumbents and challengers are similarly situated. Skinner v. Oklahoma, Craig v. Boren both make clear that where there's a discriminatory classification such as incumbent and challenger, there must be a qualitative, intrinsic difference between the classes. Here, there is none to give the state a rational basis for creating the classification. Second, there's no rational state interest at all in granting the incumbent the unilateral right to force the party to choose the nomination method of her choice. This is so clear that the Commonwealth honestly hasn't even made the argument. Instead, they've merely asserted a list of benefits they claim accrue to primaries versus conventions. But the classification that the Commonwealth has to defend is not primary versus convention versus mass meeting. It is incumbent versus challenger. That is the classification of the Act. And as Judge Diaz has pointed out, it isn't the operation of the plan. It is the operation of the Act that works the injury. The closest it comes is an unsupported assertion that granting incumbents the unilateral right to choose their nomination somehow aids the orderly functioning of the electoral process. The issue here is whether the Commonwealth has justified its distinction of incumbent versus challenger by any qualitative difference between an incumbent and a challenger, and then has it justified a rational basis for treating the two classes differently. This Court in Cromer v. South Carolina and the Supreme Court in Sobel v. Williams held that a broad state interest, even if it's a valid interest, cannot support a distinction such as this, incumbent versus challenger, unless the interest is reasonably related to the classification. But even the claimed benefits that the Commonwealth cites, such as an orderly process, a more democratic process, are asserted as benefits of a primary versus a convention or another nomination method. None of these benefits the Commonwealth cites are even tangentially related to the classification here that offends the 14th Amendment and that injures my client, incumbent versus challenger. Plyler v. Doe, Board of Trustees of Alabama v. Garrett, continue to reinforce the specific classification incumbent versus challenger here must be directly related to the interest the Commonwealth advances in its support. I'd quote here from Nordlinger v. Hahn. The Supreme Court held that, in general, the Equal Protection Clause is satisfied, so long as there is a plausible policy reason for the class, the legislative facts on which the class is apparently based rationally may have been considered as true, and the relationship of the classification to the goal is not so attenuated as to render the distinction, incumbent versus challenger, arbitrary or irrational. The Act here meets none of the Nordlinger prongs. The Commonwealth's silence on any rational state interest for the incumbent-challenger distinction and the clear text of the Act, as Judd Wilkinson pointed out in his Miller III dissent, both demonstrate the Act is unreasonable, facially discriminatory, and it denies equal protection. And again, that is because the Act, what a classification must do, when there is a class created, when it discriminates, as this one does, between the two classes, first, there has to be a qualitative, intrinsic difference between the two classes, incumbent and challenger, and they are in all respects here similarly situated. Secondly, there has to... In all respects, you said? In all respects? In all respects, an incumbent and a challenger, as relates to ballot access, as relates to being the, whether there is a primary, a convention, or so forth, are in all respects similarly situated. The law makes no difference. The law cannot discriminate between an incumbent and a challenger. They are similarly situated as regards equal protection. And what standard do we use for that? Just a rational basis? Rational basis standard, Your Honor. I think this is a clear rational basis case. The Commonwealth may... I may try to raise Lopez-Torres, which was a free association case, clearly. Is it rational to make a distinction that one is under oath to protect the Constitution of the Commonwealth of Virginia  or his or her district or political division? Is that a rational distinction? Judge, I see my time has expired. May I briefly conclude? I don't believe that it is, Judge, and it's because the... If... As the Supreme Court has made abundantly clear in case after case after case, it's not just the interest of the candidate that's at stake. It's the interest of the candidate's voters and the voters who support that candidate. That's the underlying interest that has to be protected by the equal protection. I thought my example gave... Went to their status as to obligation to the people. It does, Your Honor, and yet the... If the... Once the election is over and assuming that we... Assuming the challenger wins, whatever that nomination process, if the challenger is going to face those same obligations as the incumbent does, the important thing is making sure that, as Judge Wilkinson pointed out in his Miller III dissent, that the challenger... That was a dissent. Correct. Understood, Your Honor. But the important thing is that the channels of political change remain open so that the majority of the... The will of the majority of the voters that Your Honor's pointed out is not systematically frustrated and the act as it stands threatens to entrench the incumbent to an unconstitutional extent, as this Court plurality pointed out in Miller II. At that point, he really isn't representing the interest of the party and he may not be representing the interest of the voters as much as representing his own interest. Therefore, I don't believe that is a rational basis and there has to be something of a qualitative difference between them. Thank you. Thank you, Your Honor. All right, Mr. Heslinga. Did I say that right? Or did I get it close? Yes, Your Honor. May it please the Court, my name is Joshua Heslinga. I'm here with my co-counsel from the Virginia Attorney General's Office Anna Birkenheyer and I'm arguing on behalf of all Appleese. The party plan limits appellant's authority regarding the nomination method and it defers to Virginia law. Appellants object to the party's choices in the plan and the voters' choices in electing Senator Hanger but standing requires more than that. There are no factual disputes and the dismissal below should be affirmed. There are two primary issues of law before this Court. The first is interpretation of the party plan which is a non-ambiguous written contract. Contrary to what counsel for the appellant said, the District Court did not find that the contract was ambiguous or concede that the contract was ambiguous. Rather, it applied the plain meaning of the key limiting phrase in Article 5. Didn't she say she found one construction more reasonable than the other and when you say that kind of thing, doesn't that indicate you're resolving an ambiguity? I think you could argue that the District Court's opinion was ambiguous but I don't think that her use of more reasonable in that sense, I don't think that signaled an ambiguity. When you choose one construction over the other and say it's more reasonable haven't you resolved an ambiguity? Well, she had two constructions in front of her. One that they offered and one that we offered. But the mere fact that there are more than one construction that parties disagree about what the contract means does not make the contract ambiguous under Virginia law. If it was not ambiguous, you would say the plain language shows as a matter of law this is the appropriate construction. If you say one is more reasonable than the other, then you're resolving. I understand, Your Honor. I would point to her language where she specifically rejects the interpretation they offered saying that that's not what the plan says and that's not its plain meaning. I think that's the key portion of her opinion. I think it's clear that she's applying plain meaning. And I think that it's obviously de novo on appeal the contract interpretation. So in a sense it doesn't matter but I think it's important to note that there was no finding of ambiguity below. And the plain meaning I think is clear. You have a delegation to the committee. The committee has only the authority that the party delegates to it. And the delegation is limited to where the committee is permitted to make that choice under Virginia law. Where Virginia law provides for the choice of nomination method to be made in some other way. The committee does not have any authority to contradict it. That's the party's lawful and voluntary choice in the plan. How can that be voluntary if they have no authority to contradict it? Well, I'm glad you asked that, Your Honor. And it also goes to your earlier question about what was their other choice. They did have another choice. They had the exact same choice that the party had and actually followed in the Miller case. Which was pass an amendment to the plan expressing how you want to do things. Tell the Commonwealth that's how you want to do things. And then if the Commonwealth refuses based on a provision of Virginia law you sue. That's exactly what they did in Miller. They passed an amendment saying authorizing closed primaries. They went to the Commonwealth and said we want a closed primary. Commonwealth said no because we have this open primary law. They sued. And at the end of Miller they got a ruling that although it was facially constitutional it was unconstitutional as applied in these circumstances. So they had a clear choice. But it starts with amending the plan. As this Court said in Marshall v. Meadows if there is no indication that the party is acting under compulsion or has an objection and the party has just chosen to do what Virginia law provides then that's the party's lawful and voluntary choice. And that means that I guess I understand that. That's I think a fairly formalistic requirement where any whether a citizen, a committee, organization they don't have a choice but to comply with the law. So I'm not sure what following those formal hoops what that gets you. I think Your Honor what it does is it creates a conflict between the party plan and the statute. Well isn't the filing of a lawsuit a clear indication that they don't agree with the law? Well it's an indication that this committee, that these individuals do not agree with the provision of the plan and the provision of the law. But this committee has only the authority that the party delegates to it and the plan is the final word on anything it speaks to. That's an appellant statement of fact. The plan speaks to the committee's authority here. It limits the committee's authority and it permits Virginia law to operate wherever Virginia law provides for the choice to be made in some other way. They raised that the, this court said in Miller that the incumbent was not a representative of the party. That was true in the context of the statute which is what the court was discussing. But the party is free to let the incumbent represent the party in any matter they want. The party is free to let the incumbent choose the nomination method. And that is effectively what they did here. Let's say you're correct about the committee's lack of standing. How does your analysis implicate Mr. Moxley's standing? I think the same result and largely the same analysis applies. Individual members of the party, such as Mr. Adams, such as Mr. Moxley they are bound by the party plan which is a contract between the members under Virginia law well settled Virginia law. The district court notes in her opinion that no one disputed that that was how the party plan operated and was to be read, was as a contract between the members under Virginia law. And so by affiliating with the party, becoming part of the party, the member is agreeing to follow the plan. And so the same analysis applies and the same standing conclusions apply. There is no injury to Mr. Adams, Mr. Moxley's rights because they didn't have a right to choose the nomination method. And even if there were an injury, it's traceable to the party plan. And it's not regressible by the courts because it's the party's choice. Mr. Adams let me back up to this issue of contract interpretation and the lack of an ability to present evidence. Mr. Adams indicates that the district court truncated their ability to present evidence that they only conceded that the facts weren't disputed for purposes of the preliminary injunction hearing. Is he right? No. I couldn't disagree more. The court asks first of all they had extended briefing both before the hearing and after the hearing and never said in that briefing we have facts we want to bring forward, we need to do discovery or anything like that. They had a two hour hearing where they presented whatever argument they wanted to make, never even mentioned the word discovery. They had the opportunity to present whatever evidence they wanted to at the preliminary injunction hearing. They did that without objection and they confirmed when the district court asked them not only that there were no issues of disputed fact but also that they had no evidence regarding the key limiting phrase in the plan and then and those are on pages 203 and 223 of the joint appendix and then just a little bit later 225 said they had no history regarding the language. They'd like to go find something now the testimony of some people who might try to help them contradict what the plan says but unlike in other states and in their reply brief they cite the Powertech case, that case applies California law where apparently you are free under California law to go on a search for extrinsic evidence to explain a contract under Virginia law that's not how it works. Virginia law if it's a plain and unambiguous contract as it is here you look at the four corners of the contract and you don't go on a search for extrinsic evidence. So even if they were permitted it wouldn't be admissible. So I disagree with that and then I would also note that you can look at page 326 of the joint appendix. There was an order of the district court in which the court said I've received this notice that nobody wants a hearing on the motion to dismiss. They agreed that there would be no further hearing on the commonwealth's motion to dismiss which is very much at odds with them saying now that oh we had more it was just because it was the preliminary injunction. No they agreed there would be no hearing on the motion to dismiss and the court agreed, the district court agreed that none was necessary and there was nothing that required the district court to hold a hearing on that motion. But even after the preliminary injunction hearing when they presented more briefing, again no mention of discovery, no mention of additional facts. There was nothing to tell the district court that they had more to bring forward and obviously I don't think that anything they would have found would have been admissible anyway. So those are the two main issues before the court, the interpretation of the contract and also the subject matter jurisdiction, the standing issue. If the court gets to the Do you agree they're intertwined, those two issues? Maybe one is dependent on the other? Or resolution of one determines resolution of the other? I think the way I would say it is that the party plan is determinative in both senses. The party plan is determinative on standing grounds as set forth in Marshall v. Meadows and the party plan would also be determinative on a 12B6 motion to dismiss. And in fact the Commonwealth moved to dismiss on both grounds, 12B1 subject matter and jurisdiction standing and also 12B6. So I don't know if I would use the word intertwined because this is not a case like the scope of employment case that they rely on where you have to go find a bunch of facts. This is a case where you have a legal question, the meaning of the party plan it's determinative in both ways. But I don't think I see a tangle of facts to be resolved here. If the court does get to the constitutional merits you would apply the Anderson-Burdick framework for constitutional challenges to state election laws and the Commonwealth would prevail under that too. First under step one because there is no severe burden on constitutional rights. There's no severe burden because the party is getting exactly what the plan provides for. There's no severe burden because the Commonwealth has the right to dictate the party's nomination method and there's no severe burden because there is no lack of opportunity for ballot access. If you look at the Supreme Court case law time and time again they attach great importance to whether there is any lack of opportunity for ballot access. You can see that in the American Party of Texas v. White case. You can see that in Lopez-Torres. You can also see that in Burdick itself where the Supreme Court based its conclusion that there was a limited burden specifically saying in light of the adequate ballot access afforded under Hawaii law. In this case no one has ever said there's a lack of opportunity for ballot access under Virginia law and they couldn't. The signature requirements are very low. Mr. Moxley met them. Mr. Moxley in fact got on the primary ballot and ran against Senator Hanger as did another candidate. He had a full and fair opportunity to persuade the voters his way and was unsuccessful. But for those three reasons that you would conclude that there is no severe burden which would get you to step two of the Anderson-Burdick analysis looking at the state's interests. As we've briefed and contrary to what Mr. Boyer said the state has explained what its interests are. They are the same interests as are primaries generally, voter participation, democracy and orderly elections. And we have also explained exactly how this statute furthers these interests. It's Virginia's experience over now a few decades with this law that these disputes arise when party bosses want to get rid of a popular incumbent. I think you could see that in Marshall v. Meadows. You see that in Miller. You can see that here where they want to use a non-primary method over the incumbent's objection. As the 1973 Virginia Attorney General opinion that we cite in the brief said, the General Assembly concluded that it wanted to protect the voters who had elected an incumbent and ensure that they had the opportunity to elect an incumbent again. As Senator Hanger pointed out on page 192  because it was the best way to ensure that all qualified voters had an opportunity to participate in choosing the nominee. And both of those things are consistent with what the Supreme Court of the United States said in Lopez-Torres, which is that we have permitted states to set their faces against party bosses by requiring party candidate selection through processes more favorable to insurgents such as primaries. So the state has interest that it's explained here. They are related to the circumstances and the specific provisions in the statute. Post-Miller, there is no concern about forced association in Virginia. And whether the court is considering an as-applied challenge where you would consider all of the facts of this particular case, or a facial challenge, which cannot succeed unless the statute is unconstitutional in all applications, I think you have to consider the realities in Virginia's experience with this law over a few decades. And sure, it's possible to say that there's some theoretical, political process concern, but there is no actual concern in this case. There was ample competition in the primary, and Virginia has not experienced any actual problem in its decades with this law. Unless the statute is unconstitutional, I think that concludes what I had to say, and as I mentioned, we think the dismissal should be affirmed. Okay. I think we understand your position. Thank you. Thank you. Mr. Adams? Thank you, judges. A couple of quick points, if I could. I think I heard in some of the questioning the first time around the question of why didn't we do more to sort of make the court aware that there were factual issues, and I believe Mr. Heselgaard has identified that. Basically, we do not believe, and we do not believe we had to, that under the Kearns line of cases, we have intertwined jurisdictional and substantial facts, facts that go to the merits of the case, and in that case, it was just inappropriate for the court to resolve the matter on a factual challenge to standing at the pleading stage. And we were at the pleading stage, so it's at a time when it is not time for discovery. We have never and had never received an answer from the defendants, and so discovery hadn't proceeded. So perhaps we should have pounded the table, but that's our answer to that question. And also, it relates to the question which might be hanging in the air, why did we not ask the court to reconsider the decision when we received it? And the reason for that was, there were several, really. The first was that the court's decision was so unequivocal that we felt that it would not be profitable, and it would just waste further time, particularly given the fact that we're now moving into the next election cycle. The committee is an ongoing body, and a resolution of this matter has to be pursued as quickly as possible still, to this day. And in particular, given the fact that the court did not even entertain a hearing on the motions to dismiss Mr. Moxley's complaint, or even give Mr. Moxley time to brief the issue, we believe that the court was not interested in further argumentation and briefing. But didn't the district court give you an avenue for resolving this dispute by simply amending the plan? We could. That is a longer and more time-consuming process that, frankly, we should not be required to pursue, because we believe that the plan is already in conflict with the Act, and we believe that we will be able to deduce the evidence to establish that. The idea that, if there's an unconstitutional provision of law and the party has to go and basically, in some affirmative way, write that conflict into the plan seems to me just unwarranted on any legal standard. If there's a constitutional violation, I don't think the party has to somehow acknowledge that within the plan. What the party can do, and what the party will do, is actually rule on a definitive interpretation of the plan. There was no ability to do that during the very short life of this litigation, but that ability is there, and the court even acknowledged it. So I don't think the party has any obligation to amend the plan before it can file. And I will point out that Mr. Hesslinger has said, and there was this element of sort of the elephant not in the room at the trial level, that the party, as the party, had not in any way participated in the matter. Frankly, I think that's irrelevant, because the committee is a body of the party acting under its delegated authority, but obviously at this level, the party has intervened as an amicus, a friend of the court, and has made its position on the plan known through the act of the State Central Committee and the submission of Mr. McSweeney. Mr. Adams, I hear your argument with respect to the jurisdictional discovery issue is akin to, trust me, there are additional facts that need to be discovered, but don't, I mean, even today, can you point to something that would result if this case were to go back to the district court? Well, I will freely say that it's outside the current record, but since you've asked, the party at its June 27th meeting has, in fact, the State Central Committee of the party, which is the final arbiter of the interpretation of the plan under Article 10 of the plan, has explicitly said that it believes that the court's decision was incorrect, that the plan does not accede to the act. And that was the resolution by which Mr. McSweeney was... Sounds like a legal conclusion, not a matter of fact. That's a fair point, but we also, we can produce testimony. We have talked to individuals, again, outside the record, this is not in the joint appendix, but again, since you've asked, expecting that this will be remanded to the court under Kearns, we have spoken to individuals, and we will be able to produce evidence as to the interpretation of the plan. All right. Thank you. Mr. Boyer. Thank you, Your Honors. I need to go back and try to do a better job of answering Judge Gregory's question, as to whether there's a rational basis with regard to the incumbent's responsibility to voters in the Constitution. I would answer in the words of Justice Stevens, concurring in the Cleburne v. Cleburne Living Center. The term rational, he says, includes a requirement that an impartial lawmaker could logically believe that the classification would serve a legitimate public purpose that transcends the harm to the members of the disadvantaged class. Thus, the word rational, for me at least, includes elements of legitimacy and neutrality that must always characterize the performance of the sovereign's duty to govern impartially. As Judge Wilkinson points out in his dissent in the denial of rehearing on Bonk and Miller III, he suggests the act's plain meaning reveals that there is no public purpose other than to facially discriminate in favor of the incumbent officeholder. So I think that may be a little better answer to Judge Gregory's question. With regard, again, to Mr. Hessling's point, as to whether the individual party members are bound by the contract, the party plan, and so forth. The party plan grants the choice of nomination methods to the Legislative District Committee outright, except where permitted by Virginia law. There is no distinction whatsoever between incumbents and challengers created by the plan. As Judge Diaz, I think, hinted at earlier, the distinction, the irrational distinction between incumbent and challenger is created in the statute. And as Judge Diaz pointed out, the party has no choice, regardless of where the party's standing is, even if the party has acquiesced. The party cannot, in some sense, waive Mr. Moxley's 14th Amendment equal protection right as a condition of his participation in his exercising his free association rights to be a member and a candidate of the party. Well, you have to leave your equal protection rights behind. And again, Mr. Moxley is not in the pure status of a party member here. If he was a party member of the Stanton Committee, he's not injured. It's as a candidate, where he is similarly situated with the incumbent, that the law has created this irrational distinction, and it must treat the similarly situated. Didn't he sign on to the party plan? Don't you have to sign on that you will agree and comport your activity and conduct according to the party? Judge, I see my time has expired. Can I briefly respond? Don't you? Absolutely. Didn't he sign on to that? As Mr. Adams pointed out earlier, a waiver of constitutional rights has to be clear and compelling. I believe that he did sign on for the purposes of being a member of the party. You comport yourself with these rules. For purposes of being a candidate, he has not signed on to a waiver of his 14th Amendment right. The party can't make him do that. The statute can't make him do that. Well, you cited Justice Stevens in the concurrence. What harm is there for the people of the Commonwealth of Virginia to be able to decide who should be the person, the nominee? What's the harm? None whatsoever, Judge, and I think that's the glaring hole in the Commonwealth's argument. There may be a legitimate state interest in having a primary. That may be the best, the most open form, the most democratic form. The Commonwealth may be correct. What there is no legitimate interest in, if there is a legitimate interest in primary versus convention, there can be no legitimate interest, other than sheer discrimination, for the incumbent getting to make that choice. The Supreme Court has been clear. A state can require a primary. The Commonwealth can require a primary. We're not here to argue that. What we're here to argue is what the Commonwealth cannot do is create the class incumbent versus challenger and treat them differently and leave that determination purely in the hands of the incumbent. Thank you, Your Honors. We'll come down and re-counsel and then go into our next case.
judges: William B. Traxler, Jr., Roger L. Gregory, Albert Diaz